# EXHIBIT 4

| | |
|---|---|
| **From:** | Kelly, Michael (Ptnr-DC) |
| **Sent:** | Friday, April 3, 2020 1:16 PM |
| **To:** | 'Atkinson, Lawrence (CRM)'; Linder, Nick (USAINS); Maurer, Kyle (CRM) |
| **Cc:** | Acosta, Sergio (Ptnr-Chi); Paul, Douglas (Ptnr-DC); Mas, Ildefonso (Assoc-DC); Sean.Berkowitz@lw.com; 'eric.swibel@lw.com'; Joshua.Hamilton@lw.com |
| **Subject:** | Discovery Letter (U.S. v. Meek and Peavler) |
| **Attachments:** | April 3 2020 Discovery Letter to DOJ.PDF |

Rush, Nick, and Kyle,

Attached is the discovery letter that I had promised. We're happy to discuss any of these issues if that would be productive. Please let us know.

Best regards,

Mike

**Michael Kelly**
Partner
Akerman LLP | 750 Ninth Street, N.W., Suite 750 | Washington, D.C. 20001
D: 202 824 1716 | T: 202 393 6222
michael.kelly@akerman.com



Michael Kelly

Akerman LLP
The Victor Building
750 9th Street, N.W., Suite 750
Washington, DC 20001

T: 202 393 6222
F: 202 393 5959

April 3, 2020

**BY EMAIL**

L. Rush Atkinson, Esq.                          Nicholas J. Linder, Esq.
Kyle Maurer, Esq.                                United States Attorney's Office
U.S. Department of Justice                   For the Southern District of Indiana
Criminal Division, Fraud Section         100 West Market Street, Suite 2100
1400 New York Avenue, N.W.              Indianapolis, IN 46204
Washington, D.C. 20005

        Re:     _**United States v. Meek, et al.**_**, Case No. 19-CR-378-JMS-MJD**

Dear Messrs. Atkinson, Maurer, and Linder:

       Thank you for speaking with us on February 25, 2020 about our discovery concerns.  As I mentioned on our phone call, it has taken me more time than I would like to send you this letter, because I was involved in a serious car accident on the day after our call and had to undergo surgery in the meantime.  However, it is important that we discuss with you the status of our discovery requests.

        A.      **Requests for _Brady_ Information or Material**

       On the day of my surgery, the 6th Circuit issued an opinion in one of my previous cases, concluding that DOJ had wrongly withheld _Brady_ material.  _United States v. Paulus_, 952 F.3d 717 (6th Cir. 2020).  Throughout the case, the AUSAs had acknowledged their obligations under _Brady_ and claimed that they were unaware of any such evidence.  This made no sense to us, because we found lots of _Brady_ material in the discovery.  The district court and the 6th Circuit agreed with our assessment because they acknowledged at various points of the case that a reasonable jury must or could conclude our client was not guilty. Yet, as the 6th Circuit opinion illustrated, even the district court (which had granted a full judgment of acquittal to our client earlier in the case) did not fully recognize the exculpatory nature of important evidence that the government suppressed before trial and during the government's first appeal of our client's judgment of acquittal.

1

I raise the *Paulus* case because I see parallels beginning to develop with this case. Like the prosecutors in the *Paulus* case, you have represented that you are not aware of the existence of any *Brady* material. As with the *Paulus* case, that representation has made no sense to us, because our review has already uncovered significant material that would qualify as *Brady* material, no matter how strictly defined. That raises concerns for us that the government is viewing the scope of *Brady* far too narrowly and is not complying with its constitutional obligations. As you know, the injury caused by a *Brady* violation is not lessened whether prosecutors are acting in good faith or not. In the *Paulus* case, the Justice Department's *Brady* violation wrongfully caused my former client, a 72-year old man, to lose his freedom for over eight months.

To avoid any misunderstanding in this area, we are writing to notify you that *Brady* requires the government to disclose any materials or information suggesting, directly or indirectly and in whole or in part, that:

(i)     the valuations of the trucks at issue in the case were appropriate or defensible under any accounting standard or methodology;

(ii)    Bobby Peavler, Eric Meek, any alleged co-conspirator, or anyone else (whether employed by Celadon or not) believed at any time that the valuations of the trucks at issue in the case were appropriate or defensible under any accounting standard or methodology;

(iii)   the accounting at issue was appropriate or defensible under any standard or methodology;

(iv)    Bobby Peavler, Eric Meek, any alleged co-conspirator, or anyone else (regardless of any connection to Celadon or not) believed at any time that the accounting treatment at issue was appropriate or defensible;

(v)     Bobby Peavler, Eric Meek, any alleged co-conspirator, or anyone else (regardless of any connection to Celadon or not) believed at any time that similar valuations or accountings of similar trucks during the relevant time periods in the case were appropriate or defensible under any accounting standard or methodology;

(vi)    there was an oversight failure, honest mistake, lack of knowledge or lack of resources with respect to the valuations or accounting or any other matter referenced in the Indictment by Bobby Peavler, Eric Meek, any alleged co-conspirator or anyone else;

(vii)   there was a lack of an intent to defraud or mislead by Bobby Peavler, Eric Meek or any alleged coconspirator concerning any matter referenced in the Indictment;

52605718;1

(viii)    any person believed at any time that Bobby Peavler, Eric Meek, or any alleged conspirator lacked any intent to defraud or mislead or that there was an oversight failure, honest mistake, lack of knowledge, or a lack of resources with respect to Celadon's accounting or valuations;

(ix)    there were mistakes or failures or misunderstandings made by Celadon directors, officers, or employees or any third party (including external auditors such as BKD or banks such as Bank of America) concerning Celadon's valuations, accounting, or any other matter referenced in the Indictment;

(x)    there was evidence that any alleged recipient of the representations by anyone at Celadon understood the nature of the valuations or accounting at issue;

(xi)    Bobby Peavler, Eric Meek, or any alleged co-conspirator tried to preserve documents or any other kind of information related to matters referenced in the Indictment;

(xii)    Bobby Peavler, Eric Meek, or any alleged co-conspirator took conservative views with respect to other valuation and accounting issues not at issue in the Indictment;

(xiii)    Bobby Peavler, Eric Meek, or any alleged co-conspirator were truthful or took conservative views in their dealings with auditors, financial institutions, investors, Celadon directors, officers, or employees, Stoops, or any other third parties;

(xiv)    Bobby Peavler, Eric Meek, or any alleged co-conspirator were honest or acted in good faith in their professional or personal activities, or had a reputation for honesty and good character in their professional or personal lives.

And these are only some of the materials or evidence that would qualify as exculpatory material under *Brady*. As you know, it does not matter if the exculpatory information is itself admissible, *United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012), if it is similar to other information that is produced, or if the government credits the information or not.

If you are aware of *Brady* material in the discovery (as defined above and not in a narrow or cramped way), you must identify it to us. *United States v. Saffarina*, Crim. Action No. 19-216 (EGS), 2020 WL 224599, *28 (D.D.C. Jan. 15, 2020) (ordering the government to identify *Brady* material); *United States v. Blankenship*, No. 5:14–cr–00244, 2015 WL 3687864, *7 (S.D. W.Va June 12, 2015) (same); *United States v. Salyer*, Cr. No. S–10–0061 LKK (GGH), 2010 WL 3036444, *6 (E.D. Cal. Aug. 10, 2010) (same); *United States v. Hsia*, 24 F.Supp.2d 14, 29-30 (D.D.C. 1998) ("The

government cannot meet its *Brady* obligations by providing [the defendant] with access to 600,000 documents and then claiming that she should have been able to find the exculpatory information in the haystack.").

These courts have recognized in these so-called "big document" cases that the government does not discharge its *Brady* obligations by simply disclosing millions of pages of documents that it has collected. While you have provided a targeted production of documents that you believe to support the government's case, that does not discharge the government's obligation to identify *Brady* material. As the court stated in *Salyer*, "it bears repetition to emphasize that the ultimate issue is whether there is 'disclosure' in the letter *and* spirit of *Brady/Giglio* simply by turning over a mountain of 'everything' acquired over half a decade, and telling defense counsel nothing about where exculpatory/impeaching information can be found." 2010 WL 3036444, at *6.

Even more importantly, in light of our clarifications of *Brady*, we are requesting that you review *all* interview memos and related materials in the government's possession – including but not limited to memos drafted by (or interviews conducted by) the government – to ensure that all *Brady* material has been produced. If *Brady* information was learned in the course of any interview and was not recorded in the 302 (or SEC notes or other similar documents) for whatever reason, it nonetheless must be disclosed to us. Obviously, if there are mistakes in the 302 or other memoranda, or if there was a difference of recollections among the attendees, that information must be disclosed too. As an example (and without limiting the foregoing in any way), we request that the government review all 302s and other documents reflecting interviews of, or statements by, Danny Williams for potential *Brady* material.

That was another problem in the *Paulus* case: agents never wrote down exculpatory information they heard, and we either did not learn of the information until it was too late or we heard from witnesses that the government was not writing down information that was favorable to our client. It has been a problem in other cases too. *See, e.g.*, *United States v. Brissette*, No. 16-cr-10137-LTS, 2020 WL 708034, *9 (D. Mass. Feb. 12, 2020). As you know, in another letter, we have expressed deep concerns about the accuracy of the government's interview memorandum of Mr. Peavler, and we have every reason to believe that the same problems exist with respect to other interviews in this case. If the trial is to be fair, all *Brady* material must be produced promptly, especially from those interviews in which only the government participated.

All of our requests are consistent with the Justice Manual and with the last-published criminal discovery guidelines by the U.S. Attorney for the Southern District of Indiana. Section 9-5.001(D)(1) of the Justice Manual acknowledges that "[e]xculpatory information must be disclosed reasonably promptly after it is discovered." It does not endorse a prosecutor conducting a *Brady* review through a narrow lens: "[a] prosecutor must disclose information that is inconsistent with any element of any crime charged against the defendant or that establishes a recognized

affirmative defense, regardless of whether the prosecutor believes such information will make the difference between conviction and acquittal of the defendant for a charged crime." Section 9-5.001(C)(1). Similarly, the District's last published criminal discovery guidelines acknowledged that "[i]n this District, we interpret *Brady* and *Giglio* broadly" and "[i]f an AUSA has any doubt whether a piece of evidence is exculpatory, the evidence should be disclosed."[1]

Please let us know your positions on these points. If we cannot arrive at an agreement with you, we will seek appropriate relief from the Court.

**B.    Materials Held by the SEC**

During our call on February 25 and in correspondence to us and counsel for Mr. Meek, you have reiterated the government's position that the SEC was not part of the prosecution team and the government does not have an obligation to ask the SEC to produce *Brady* material or to search the SEC files for responsive Rule 16 materials.

First, your position is a departure from many cases where DOJ has voluntarily produced documents from the SEC and reviewed unproduced SEC documents for *Brady* material even if SEC staff members were not considered part of the prosecution team. *See, e.g.*, *United States v. Collins*, 409 F. Supp. 3d 228, 240-41 (S.D.N.Y. 2019) (SEC agreed to produce "a significant portion of its investigative file to Defendants" and DOJ reviewed the remainder for *Brady* material and promised to produce them pursuant to the scheduling order); *United States v. Sledziejowski*, No. 3:16-cr-101-B, 2018 WL 1014181, at *1 (N.D. Tex. Feb. 21, 2018) ("[t]he government agrees to review [the SEC's] file in this matter to determine if there are materials, beyond those the government previously produced, that are responsive to the defendant's request" and agreed to produce responsive material). Indeed, the Southern District of Indiana's discovery policy advises that "AUSAs should take an expansive view and err on the side of inclusiveness in deciding who should be considered part of the 'prosecution team.'" SDIN Criminal Discovery Policy at p. 3.

There is no good reason not to follow this practice in this case. As you know, SEC materials frequently contain *Brady* material or other documents material to the defense. *See, e.g.*, *United States v. Mahaffy*, 693 F.3d 113, 131 (2d Cir. 2012) (*Brady* violation found because SEC depositions were withheld). Among other things, *Brady* or other important defense material can be found in transcripts of SEC testimony, interview notes by staff attorneys, Wells submissions, correspondence from counsel for companies or individuals, and other documents produced by parties pursuant to subpoena or through voluntary submissions. The interests of justice are not served by suppressing exculpatory documents or other documents material to the defense held by the SEC. That is how innocent people can be convicted.

---

[1]    Memorandum of U.S. Attorney Joseph J. Hogsett to All Criminal AUSAs, October 14, 2010 at p. 7, located at https://www.justice.gov/sites/default/files/usao/pages/attachments/2015/04/01/ins_discovery_policy.pdf ("SDIN Criminal Discovery Policy").

Second, we also believe your narrow interpretation of the prosecution team is wrong as a matter of law. At the very least, the SEC participated in at least some prosecution team interviews, shared substantial documents with the prosecution team, coordinated the timing of enforcement actions with the prosecution team on repeated occasions, and agreed to stay its own case at the request of the Justice Department. Both agencies have thanked each other repeatedly in press releases for their assistance. That, in itself, shows that the SEC was acting as part of the prosecution team.

To help us determine whether to bring a motion to compel on this point and to expedite the Court's consideration of this motion, we request that the Justice Department answer the following questions:

- How many interviews did any staff member of the SEC attend in this or any related matter with the Justice Department, the Federal Bureau of Investigation, or any member of the prosecution team as the government defines it? Did a SEC staff member ask any questions during those interviews? If so, how often?

- Did any SEC staff member attend any testimony presented before the grand jury? Were any transcripts from the grand jury shared with any SEC staff member? Was any SEC staff member designated as a Special Assistant United States Attorney in this or any related matter?

- How many times did any staff member of the SEC discuss the investigation in this or any related matter (either in person or in writing or over the telephone) with any member of the Justice Department, the Federal Bureau of Investigation, the Postal Inspection Service or any other member of the prosecution team as the government defines it? Were there any regularly scheduled meetings or calls? If so, did those meetings occur at regular intervals (weekly, monthly, etc.)? Did any SEC staff member ever suggest investigative leads for any member of the Justice Department, the Federal Bureau of Investigation, the Postal Inspection Service or any other member of the prosecution team as the government defines it, to pursue?

- Did any SEC staff member participate in any meetings with third parties (like Celadon or BKD) alongside the prosecution team as the government defines it?

- On how many occasions has any staff member of the SEC shared information concerning the investigation with any member of the Justice Department, the Federal Bureau of Investigation, the Postal Inspection Service, or any member of the prosecution team as the government defines it? How many times has any SEC staff member received information concerning the investigation from any member of the prosecution team as the government defines it?

6

- Has a staff member from the SEC ever declined a request for information or assistance in this or a related matter from any member of the Justice Department, the Federal Bureau of Investigation, the Postal Inspection Service, or any member of the prosecution team as the government defines it? If so, what was the request declined?

- Was a draft copy of the indictment or other charging instrument in this or any related matter made available to any SEC staff member prior to its filing with the Court? If so, did any staff member suggest a change to the Indictment and was any such change made?

- Was a draft copy of the SEC's complaint available to any member of the Justice Department, the Federal Bureau of Investigation, or any member of the prosecution team as the government defines it? If so, did any of those individuals suggest a change to the complaint by these individuals and was any such change made by the SEC?

We appreciate the government's cooperation in responding to these questions. If the government chooses not to cooperate, our intention is to bring a motion and ask for the Court to order a response from the government on these topics.

### C. Materials Held By Celadon

The Justice Department also has an obligation to produce documents held by Celadon that are *Brady* material or constitute evidence material to the preparation of the defense under Rule 16. As we previously wrote, the prosecution team exercises "control" over documents in Celadon's possession because it has the legal right to demand the production of those documents at any place or time of its choosing:

- Under paragraph 5 of Celadon's Deferred Prosecution Agreement, Celadon "shall cooperate fully with the Fraud Section and the Office in any and all matters relating to the conduct described" in the DPA, which includes "the obligation to provide to the Fraud Section and the Office, upon request, any document, record or other tangible evidence about which the Fraud Section or the Office may inquire of the Company." DPA at ¶5(a).

- Moreover, as you pointed out in one of our earlier calls, the bankruptcy court has approved orders stating that, in any sale or acquisition, "[n]o Party shall destroy or otherwise abandon any such documents or records without providing the other Parties and the SEC and the DOJ at least 30 days' prior written notice of its intent to abandon or destroy such materials, and a reasonable opportunity to obtain possession thereof." *In re Celadon Group*, Case No. 19-12606 (KBO) (D. Del.), Docket Entry No. 218 at 12; Docket Entry No. 219 at 14. Those parties must also provide "reasonable access" to documents sought by the DOJ.

Under similar circumstances, the government has been ordered to produce corporate documents under its control pursuant to both Rule 16 and *Brady*. *United States v. Stein*, 488 F. Supp. 2d 350, 369 (S.D.N.Y. 2007) (requiring the government under Rule 16 to produce

documents in the possession of a party subject to DPA agreement with similar requirements). Other courts have recognized the correctness of this ruling.  *See, e.g.*, *United States v. Baroni*, No. 2:15-CR-00193-SDW, 2015 WL 9049528, at *4 n.8 (D.N.J. Dec. 16, 2015) (acknowledging that Rule 16 can "reach to a non-party if the government had 'possession, custody or control' over the materials Defendants seek"); *United States v. Tomasetta*, No. 10 CR 1205 PAC, 2012 WL 896152, at *5 (S.D.N.Y. Mar. 16, 2012) ("If the Government has a written agreement with the third party giving it the legal right to obtain documents upon demand, however, the Government may be in 'control' of such materials, even if in the possession of third parties."); *see also United States v. Smukler*, No. CR 17-563-02, 2018 WL 3632148, at *3 n.2 (E.D. Pa. July 31, 2018) (acknowledging that this unqualified right distinguished the *Stein* case from other cases holding that the government is not required to obtain *Brady* material from cooperating witnesses).

That common-sense approach to "control" is consistent with 7th Circuit caselaw. *See, e.g.*, *United States v. Tomkins*, 782 F.3d 338, 348 (7th Cir. 2015) (characterizing as "meager" attempts by prosecutors to argue "Rule 16 does not impose a duty on federal prosecutors to obtain documents in possession of state police"); *see also United States v. Santiago*, 46 F.3d 885, 894 (9th Cir. 1995) ("We . . . reject the district court's finding that the government has 'possession and control' over the files of only those agencies that participated in the investigation.").  It would not make any sense if the government could use its contractual rights to force the production of documents favorable to its case while strategically or otherwise leaving exculpatory documents or other documents material to the defense at Celadon.  As with the SEC issue, this kind of myopic approach can lead to the conviction of innocent people.

While we are not required to disclose our theory of the case to you at this stage, there is no doubt that exculpatory documents exist at Celadon, that they are under the prosecution team's control and that they have not been produced.  For instance, we told you in our telephone call on January 10, 2020 that Bobby Peavler had asked IT to recover emails that Danny Williams had previously deleted.  That counts as *Brady* material and responsive Rule 16 evidence under any definition of those terms, because it directly undercuts the Indictment's allegation that "Peavler encouraged Williams to delete certain emails in order to avoid Accounting Firm 1 to locate those emails."  Indictment at ¶ 43.  Yet, despite us identifying this information to the government months ago, there has been no production of any of the emails of the IT personnel.  It does not appear that the IT personnel are even custodians of documents that were produced by Celadon.  That is only one example of the type of documents that we have requested, and the government has refused to produce so far, despite its unquestioned control over Celadon documents.

It is often said that a federal prosecutor "is the representative not of an ordinary party to a controversy, but of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Berger v. United States*, 295 U.S. 78, 88 (1935).  Said another way, "[t]he United States wins its point whenever justice is done its citizens in the courts." *Brady v. Maryland*, 373 U.S. 83, 87 (1963).  In this case, exculpatory documents can be obtained and used in this trial if you simply sent an email to Celadon with our requests.  It would turn those old

sayings on their head if a citizen of the United States were forced to proceed to trial without the benefit of exculpatory or other favorable documents simply because the government does not want to send an email to Celadon. We ask that you reconsider your position on this point.

### D.  Other Rule 16 Materials

You have represented that the prosecution team (as you have defined it) has not withheld any materials that it has received from third parties either directly or indirectly through the SEC. You have clarified that you have withheld materials related to your negotiations with Celadon's deferred prosecution agreement, including revisions to the statement of facts, and other parties. In the meantime, I understand from your April 1 correspondence that you have produced Celadon's and BKD's presentations to the Justice Department and Celadon's presentation to the SEC (which you received from Celadon's counsel).

While we appreciate your April 1 production and thank you for it, we do not believe that there is any basis to withhold all of the other materials related to the efforts of Celadon or other third parties—including Danny Williams—to persuade the Justice Department. Communications the government may have had with such third parties and their counsel, and other similar materials, are not privileged and are relevant to the defense because they showed how Celadon's and the other parties' understanding of the transactions changed over the course of time. In *Stein*, 488 F. Supp. 2d at 369, in nearly identical circumstances, the court ordered the government to produce similar materials, including a portion of a company white paper, drafts of the statement of facts which were ultimately used in the deferred prosecution agreement with the company, and correspondence between the company and the government concerning any of the alleged events in the indictment. There is no reason why those types of documents should not be produced here.

### E.  Backup Tapes

We appreciate your offer to facilitate the collection of 18 boxes of backup tapes from Celadon. We would like to work with you to ensure that non-privileged documents can be reviewed by the parties. Please let us know when you have obtained custody of the tapes.

### F.  Subpoenas

During our February 25 call, we asked for copies of subpoenas that prompted parties to produce the documents that you have forwarded to us. You have produced one subpoena from the SEC to Celadon, but we have not seen any other subpoenas. You indicated that you would look into it. The production of these subpoenas will help to identify the limits of the documents that were requested by the government and allow us to present targeted Rule 17 motions to the Court.

### G. **Privilege Logs**

Finally, we have asked you to determine whether Celadon has produced privilege logs, and you told us that you would look into it. We have seen instances in Celadon's production where there is no indication of why documents were withheld or redacted and whether there was an appropriate basis to do so. We request that you produce any privilege logs that you received from Celadon. If Celadon has not produced a privilege log, we believe that Celadon should provide one. The same is true with respect to BKD, Stoops, or other third parties.

*     *     *

We are available to discuss this letter if that would reduce the areas in dispute before we ask the Court for relief. We are simply looking for the documents that are necessary to ensure that our client receives a fair trial and is able to support the defenses that we believe he has. As you can see from earlier in the letter, that did not happen in my last case, despite the broad assurances we received at the time from the Justice Department. We ask that you work with us to ensure that does not happen again in this case.

Sincerely,

/s/  Michael Kelly

Michael Kelly

cc:     Sergio E. Acosta, Esq.
        Douglas B. Paul, Esq.
        Ildefonso P. Mas, Esq.
        Sean M. Berkowitz, Esq. (by email only)
        Eric R. Swibel, Esq. (by email only)
        Joshua G. Hamilton, Esq. (by email only)