UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 1:19-cr-00378-JMS-MJD-2 |
| | ) | |
| WILLIAM ERIC MEEK and | ) | |
| BOBBY LEE PEAVLER, | ) | |
| | ) | |
| Defendants. | ) | |

### DECLARATION OF ERIC P. MANDEL

I, Eric P. Mandel, hereby declare as follows:

**Introduction**

1. My name is Eric P. Mandel. I am employed as a consultant at Driven, Inc. ("**Driven**"), where I provide advice and guidance to clients on a wide variety of issues related to electronic discovery ("**eDiscovery**"), information governance, data regulatory compliance, privacy and data protection.

2. I am an attorney licensed to practice law in California (#178162) and Minnesota (#0396252), and a legal technologist with certifications from the Association of Certified E-Discovery Specialists (CEDS) and the International Association of Privacy Professionals (CIPP/US).

3. Over the past fourteen-plus years, I have held positions at both law firms and service providers, including serving as eDiscovery counsel on behalf of both plaintiffs and defendants in small-to-large scale litigation. During that time, I have established significant personal knowledge with hands-on experience in the legal and technical requirements for eDiscovery, including how backup tapes are processed.

4. In addition to my practice, I have served in senior leadership roles in several U.S.-based "think-tanks" and trade associations specializing in eDiscovery issues, including The Sedona Conference, the Association of Certified E-Discovery Specialists, EDRM, and the Legal Technology Professionals Institute.

5. Since 2009, I have served as faculty in over seventy continuing legal education programs on a wide variety of topics related to my areas of expertise. I have also written over twenty published articles and papers in addition to contributing to or authoring numerous noted publications including: The Sedona Principles, Third Edition, the Minnesota CLE E-Discovery Deskbook (Ch. 10 – New Rules, Evolving Standards), the BBNA Corporate Portfolio Records Retention for Enterprise Information Governance.

6. I have written and presented extensively on discovery standards and the applicable Federal Rules of Civil Procedure (Rules 1, 16, 26-37, 45), including serving as a drafter of The Sedona Conference's recommendations to the Civil Rules Committee for the 2015 amendments to the Federal Rules of Civil Procedure. Additionally, I co-authored a journal article with the Hon. James C. Francis, IV, ret. (S.D.N.Y.) on Rule 37(e) and the use of Inherent Authority.

7. I have been engaged by Akerman LLP ("**Akerman**"), counsel for Bobby Peavler, to provide my expert opinion regarding the process of restoring of backup tapes that I understand were sent from Celadon Group, Inc. to the Federal Bureau of Investigation (FBI).

8. In preparing this declaration I have reviewed the following materials that I understand were provided by the Justice Department to Akerman:

    a.       A pdf labeled "Box 1 doc 1" containing an apparent inventory listing of backup tapes ("Box 1-1 List")

    b.       A pdf labeled "Box 1 doc 2" containing an apparent inventory listing of backup tapes with the handwritten notation "original iron mountain listing before Access Corp" ("Box 1-2 List").

    c.       A pdf labeled "Box 8 doc 1" containing an apparent inventory listing of backup tapes ("Box 8-1 List").

**Overview of Backup Tapes**

9. There are two primary methods by which organizations can store large volumes of information intended for disaster recovery or archival purposes. Up until the last five to ten years, the primary method was the use of tape drives and magnetic tape media.

10. These magnetic tapes come in a variety of physical cassette formats, with one of the most common being the Linear Tape-Open ("LTO") format. LTO is a non-propriety, open standard format for backup tape storage media. Over time, the storage capacity for LTO tapes has increased. For example, the LTO-5 version, first released in 2010, can store up to 3 Terabytes (TB) of compressed data on a single LTO cassette tape, while the most current version, LTO-9, being capable of storing 45 TB of compressed data on a single LTO cassette tape.

11. Companies can use specialized software designed to compress and encrypt large volumes of electronically stored information ("ESI") contained on company email and file storage servers, and place that compressed data on LTO tapes that can be either reused in regular intervals or placed into long term archival storage.

12. There are several companies that develop and offer this type of software, including Veeam, Commvault, and Veritas.

13. The primary benefit of using backup storage media (such as LTO tapes along with backup software for compression) is that it permits a company to retain large volumes of information in a small form factor for extended periods. However, there are also drawbacks.

14. While data stored on a hard drive, CD-ROM or USB drive can be easily connected to a computer and immediately read, data that has been compressed and encrypted using backup software, such as Veeam, and placed on backup magnetic media, such as LTO tapes, is materially different. Not only do you need a LTO tape drive, but you also need a version of the original software, such as Veeam, to decrypt and then decompress the data to make it readable. This process is generally referred to as "restoration" or "to restore" a backup tape.

**The Celadon Backup Tapes**

15. My examination of the limited materials provided (*see* ¶8, *above*) appears to show a large number of LTO backup tapes being retained in storage boxes that had been in the possession of either Iron Mountain and Access Corp, which are well-known national providers for long-term storage of physical and electronic records, including backup tapes, in secure, controlled environments.

16. The first page of the Box 1-1 List contains text that reads "Veeam Encryption Passwords" followed by two sets of twelve alpha-numeric and special characters appearing to be random generated passwords. This indicates that information contained on the LTO

tapes in Box #1 was generated using Veeam's software and protected with the two sets of passwords.

17. The Box 1-2 List and the Box 8-1 List do not contain any reference to Veeam or any passwords. However, for the purposes of this declaration, I have assumed that all of the backup tapes were created by Celadon using the Veeam software and were not subject to any sort of specialized encryption or encapsulation.

**The Restoration Process**

18. To restore the LTO tapes presumably created by Celadon, someone will need to have one or more LTO Tape drives, the Veeam software, and the password for each tape. While it is my understanding that the Veeam software uses the same encryption password for all tapes generated by that system, without the password, the tape will not be capable of being restored.

19. Law firms and eDiscovery providers generally do not maintain the capabilities to restore backup tapes, but instead rely on vendors who specialize in backup tape restoration and recovery.

20. Once the LTO tapes are provided to the vendor, the process generally begins with a visual inspection of the backup media to make sure that the cassette and magnetic tape inside do not appear to have been damaged or subject to degradation that can occur over time.

21. The LTO tape would then be placed into a LTO tape drive where it will be decrypted, and using the appropriate software and provided passcode, the tape is scanned to validate and determine the backup software and version that was used to create the tape and whether it is part of a set of tapes from a backup session. The vendor has the option of running a

scan that generates a catalogue of the entire contents of the tape, including primary metadata, similar to a directory scan on a Windows or MacOS machine.

22. The client can then review the catalogue and make a decision on whether to instruct the vendor to not restore a tape, to restore the entire contents of the tape, or to only select specific elements, if that is possible depending on the type and format of information on the tape.

23. The vendor can then proceed and perform the restoration process of decompressing and extracting all or select elements from the tape.

24. If the LTO tape contains backup of a mail server, such as Microsoft Exchange or Lotus Domino, the entire server database, known as an "EDB" will need to be restored and decompressed. It can then be searched, and a list can be generated of each mailbox name within the EDB. The selected mailboxes can then be extracted into the original container format (e.g., a .PST file for Microsoft Exchange/Outlook emails).

25. Once the restoration is complete, the ESI can then be brought into the standard eDiscovery processes, which would include processing, deduplication, preparing load files, and then review and production.

26. A tape restoration vendor can perform the ESI processing, deduplication and preparing load files for an additional fee, or that work can be performed by an eDiscovery service provider through standard procedures at the prevailing rates.

**The Approximate Cost of Restoration**

27. It is my understanding that there are two tapes containing a point-in-time snapshot of the mailboxes of 106 individuals at Celadon.

28. Assuming we have two tapes containing the emails for 106 individuals created using Veeam software that are in working condition and for which we have the correct password, and no other unforeseen issues arise, a reasonable estimate for the commercial cost of restoration would be in the range $5,500 - $8,000. Depending on the circumstances, including technical issues and pre-negotiated rates, the actual cost could be higher or lower.

29. It is reasonable to expect that timeline to complete this work can be as little as one week, although it could take longer depending on a variety of factors.

30. The aforementioned cost and time estimate for obtaining the ESI from the aforementioned two tapes does not include processing or loading the emails into a review platform, actually reviewing the information for relevance or privilege, and producing the information to the opposing side in accordance with the applicable rules.

31. In ¶22, I note that there is a phase in the restoration process where a party or parties can review a catalogue of information contained on the tape prior to the actual full restoration. At that stage of the process, decisions can be made as to whether to skip that tape, or to fully or partially restore the data on the tape, subject to any technical limitations.

32. It is difficult to estimate the average cost of restoring a single tape due to a large number of variables, including, primarily, what type of information is contained on the tapes, as well as tape volume, any volume discounts and pre-negotiated rates that may come into place. For example, the commercial cost of restoring tapes containing email boxes may be much higher than the price of restoring tapes containing loose files from a storage server, particularly if the vendor is charging for restoration on a per mailbox level.

33. At a larger volume, a reasonable estimate of the average commercial cost of restoration would be in the range of $1,000 to $2,000 per tape, factoring in a mix of email servers and storage servers. At smaller volume, with less variation and loss of volume discounts, a reasonable estimate would like increase to $2,000 to $4,000 per tape. As noted above, actual average commercial costs may vary based on a variety of factors such as time requirements, actual volume, and pre-negotiated rates.

I declare under penalty of perjury that the foregoing is true and correct. Executed on this 27th day of October, 2020 in Minnetonka, MN.

Eric P. Mandel